## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SANDRA SALMON,

     *Plaintiff*,

     v.

DENIS McDONOUGH,
     Secretary of Veterans Affairs, et al.,

     *Defendants*.

No. 3:22-cv-01207-MPS

## RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

This action arises from the Department of Veterans Affairs' ("VA") 15-day suspension of its nurse case manager, Sandra Salmon, for delaying the care of two patients. Salmon appeals the suspension and seeks to have it reversed and removed from her record or, alternatively, to have a new disciplinary hearing. Before me are the parties' cross motions for summary judgment based on the administrative record before the VA. For the reasons stated below, I grant the Secretary's motion for summary judgment and deny Salmon's motion for summary judgment.

## I.   BACKGROUND

### A.  Factual Background

Salmon was hired as a registered nurse at the West Haven VA Medical Center in 2001. ECF No. 23-1 at 330. During the relevant timeframe, Salmon worked as a Nurse III Case Manager. *Id.* at 871. In this role, Salmon was responsible for "collaborating with services internal and external to the VA to facilitate care transition in order to effectively meet the

patients' needs" and coordinating with various healthcare providers "to maintain access for new referrals and timely follow up."  *Id.* at 291.

### 1.    Patient A

On October 5, 2020, Patient A was seen in the Emergency Room at the West Haven VA Medical Center for wounds to his right foot and leg.  *Id.* at 348–49, 431.  On October 6, the hospital's call center alerted Salmon via the Computerized Patient Record System ("CPRS") to the patient's need for home services to care for the leg.  *Id.* at 46, 158, 348.  The next day, Salmon entered a note into CPRS noting the need for wound care and dressing changes:  "Patient needs Face to Face visit with primary care provider ASAP and scheduled the patient for this visit on 10/13/2020 requesting wound care services."  *Id.* at 348.  Salmon also entered an "Accounting of Disclosure Note" for release of the patient's information to Utopia Home Care ("Utopia"), a home health care service.  *Id.* at 348.  On October 13, 2020, Patient A's primary care provider ("PCP"), Dr. Patricia Cronin, saw the patient and referred him to home wound care services.  *Id.* at 575.  Salmon testified that on October 14, she sent Utopia the necessary documentation to initiate home wound care services.  *Id.* at 948–50.

On October 23, 2020, Dr. Cronin saw Patient A for a follow-up.  *Id.* at 349.  She noted that "[p]atient states that no one was coming to perform wound care and patient was doing his own leg dressings."  *Id.*  On October 29, 2020, Dr. Cronin again saw Patient A and noted that "[t]he Patient has not received home health care for dressing changes."  *Id.*  Dr. Cronin alerted Salmon that the "[p]atient states there have been no home services for wound care" and asked Salmon to "[p]lease check" on the situation.  *Id.* at 65, 349.  Later that day, Salmon entered a note in the patient's case management file stating "[c]all placed to Utopia home care left voice message with contact information for Therese and Cheryl to return call to discuss service."  *Id.* at

349.  The next day, Salmon entered another note stating "[a] call was placed to Utopia home care spoke to Cheryl 203 466 3050 to explore why the Veteran does not have the services in the home.  Per agency, waiting for fac[e] to face, face to face was sent with W10-refaxed so home services can start."  *Id.*  Dr. Cronin saw the patient again on November 24 and noted that the leg looked worse and that the patient continued to lack home care.  *Id.* at 350.  Her note alerted Salmon that "the patient never received the Utopia home care services for wound care ordered in October 2020."  *Id.*  The next day, Salmon made an addendum to the provider's note, which stated "[s]ocial worker to explore transportation in the community and or seek VA eligibility." *Id.*

On December 2, the patient was seen in the emergency room.  The emergency room noted that the patient's condition was "worsening" and put in a wound care consult.  *Id.* at 351. The next day, the patient contacted the hospital's call center about the consult, explaining that he was not able to get an appointment for several weeks and that he needed care immediately.  *Id.* On December 7, Dr. Cronin put in another consult requesting home wound care services.  *Id.* The next day, Antonia Cazaubon, a case manager filling in for Salmon, entered documentation for the consult and entered the following note in the patient's file:

> Consult received from PCP for home nursing visits for the Veteran who needs wound care.  Utopia Home Care agency was contacted and can provide services within 24.0-48.0 hours.  All documents were sent to the agency.  The Veteran was contacted regarding the above, he was provided the name, contact number and start day of services and to expect a call from the agency to set up a time for the visit. The veteran verbalized understanding and read back the information, he had no question or concerns at this time.  Writer provided her contact information as well and encouraged the Veteran to call with any future concerns regarding the home care services.

*Id. see also id.* at 58.  Utopia started providing home wound care services shortly thereafter.  *Id.* at 351 (indicating that on December 17, Dr. Cronin saw the patient and confirmed that Utopia

had begun home wound care services); 447–48 (indicating that Utopia "open[ed] the case" on December 16).

### 2. Patient B

On December 29, 2020, Dr. Andrea Ruskin entered a hospice referral for Patient B, who had a "life-limiting illness." *Id.* at 471–72. Luisa Howard alerted Salmon to the home hospice referral the next day. *Id.* at 473–75. On December 31, Dr. Cronin entered a separate referral for Patient B, *id.* at 600–01; she testified that she "received a request that the patient was looking for hospice care" and that she "started to facilitate the issue because it was an urgent thing . . . ," *id.* at 601. She also alerted Salmon of the need for home hospice services via the Teams platform. *Id.* at 610. Later that day, Salmon entered an addendum into Patient B's CPRS file, stating "[p]atient needs to be seen ASAP as soon as tomorrow due to his rapid decline" and listed Beacon Hospice ("Beacon") as the providing agency. *Id.* at 84. Salmon did not document on CPRS what information she sent to Beacon. *Id.* 561-62, 609. Salmon maintains that she sent sufficient clinical materials to Beacon to initiate care. *Id.* at 358–59.

On Saturday, January 2, 2021, Patient B's daughter called the emergency department indicating that hospice services had never been received. *Id.* at 746. On that day, a social worker, Mallory Baker, documented the need for hospice services, contacted Beacon, and faxed clinical information to the agency. *Id.* at 745–46. Hospice care arrived at the patient's house later that day. *Id.* at 636. Shortly after the hospice nurse arrived, Patient B died. *Id.*

On January 4, Dr. Cronin entered a note into Patient B's CPRS file, stating that she called Patient B's daughter who stated that Patient B had "total body pain" and that he "could have used morphine" at the time of his death. *Id.* at 73. Dr. Cronin also reported that Patient B's

daughter was upset with the VA's care for her father and that the daughter stated that "the process was not smooth" and that "the ball was dropped." *Id.*

### B. Procedural Background

On June 28, 2021, Ryan S. Lilly, Network Director of the VA New England Healthcare System, sent Salmon a charging letter proposing to remove her from her position. *Id.* at 41–44. The letter contained two charges: (i) delay of care—which contained two specifications, one pertaining to Patient A and the other pertaining to Patient B—and (ii) inappropriate conduct. *Id.* On July 23, Renee Oshinski, Assistant Under Secretary for Health for Operations, sent Salmon a decision letter explaining that she had sustained the delay of care charge but not the inappropriate conduct charge. *Id.* at 33–34. The letter also explained that Oshinski had decided to impose a 15-day suspension rather than remove Salmon from her position. *Id.*

Salmon appealed this decision to the VA's Disciplinary Appeals Board ("DAB"). *Id.* at 18–20. Salmon argued that the record did not support sustaining a delay of care charge and that the decision was motivated by Salmon's role as president of the American Federation of Government Employees ("AFGE") Local 2138 and actions she took in that capacity challenging allegedly nepotistic hiring practices at the West Haven VA Medical Center. *Id.* The VA appointed three individuals as members of the DAB panel, *id.* at 3, and a hearing was held from December 7 to December 9, 2021, *id.* at 391–1064 (hearing transcripts).

On January 24, 2022, the DAB issued its decision upholding the delay of care charge on both specifications. *Id.* at 1065–71. Regarding Salmon's care for Patient A, the DAB concluded that "Salmon failed to meet [the VA's] documentation requirements and failed to appropriately communicate with her team members and [Patient A] on critical patient care needs causing a delay in care . . . ." *Id.* at 1068. Regarding Patient B, the DAB concluded that Salmon "did not

follow agency protocol in consult management procedures and initiating timely home care services for Veteran B.  The evidence shows that Ms. Salmon failed to send all required documents to initiate hospice care for Veteran B at the end of his life." *Id.* at 1070.  The DAB also determined, "based on an examination of the Evidence File, a review of all of the testimony, and a review of the Table of Penalties, that the penalty of suspension is within the range of reasonableness to serve as a sanction for the conduct." *Id.*  The Secretary executed the decision of the DAB. *Id.* at 1072.

On September 23, 2022, Salmon, proceeding *pro se*, filed a complaint against the VA and several VA personnel challenging her suspension.  ECF No. 1.  Salmon seeks to have the decision of the Secretary reversed and the suspension removed from her record or, alternatively, to have a new hearing before the DAB. *Id.* at 4.  Salmon filed her motion for summary judgment on July 28, 2023, ECF No. 20, and Defendants filed their cross motion for summary judgment on August 28, ECF No. 27.  Salmon subsequently filed an amended motion for summary judgment, ECF No. 30, and a supplement to her motion for summary judgment, ECF No. 33.

## II.   LEGAL STANDARD

VA employees subject to a "major adverse employment action"[1] by the DAB may obtain judicial review of the decision under 38 U.S.C. § 7462(f)(1).  The reviewing court:

> shall review the record and hold unlawful and set aside any agency action, finding, or conclusion found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) obtained without procedures required by law, rule, or regulation having been followed; or

---

[1] Major adverse employment actions include suspension, transfer, reduction in grade, reduction in basic pay, or discharge.  38 U.S.C. § 7461(c) (2)(A)-(E).  Because Salmon was subject to a suspension, this case involves a major adverse employment action.

(C) unsupported by substantial evidence.

38 U.S.C. § 7462(f)(2).  Given the very similar language of this provision and the Administrative Procedure Act ("APA"), courts may apply analogous APA precedents to § 7462 cases.  *See Gregor v. Derwinski*, 911 F. Supp. 643, 652 n.6 (W.D.N.Y. 1996) (noting that "the language describing the circumstances under which agency action may be set aside under § 7462 is very close, and partly identical, to that in the APA"); *Hakki v. Sec'y, Dep't of Veterans Affs.*, 7 F.4th 1012, 1028 (11th Cir. 2021) ("The bases for APA review overlap with § 7462."); *Wesley v. McDonough*, No. 21-CV-02948, 2022 WL 19228924, at *2 (N.D. Ill. Apr. 18, 2022) (noting that standards of § 7462 are "[a]kin to the [APA]" and that the "procedures" for resolving claims under the two statutes are "essentially the same").

As is true "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal" in appeals under § 7462, *State of Connecticut v. U.S. Dep't of Com.*, No. 3:04-CV-1271, 2007 WL 2349894, at *1 (D. Conn. Aug. 15, 2007), and confines its review to the administrative record, *Rubin v. Miller*, 478 F. Supp. 3d 499, 503 (S.D.N.Y. 2020).  A court reviewing agency action "will not disturb an agency's decision if it determines that the outcome of the agency action would be the same absent agency error."  *Magellan Tech., Inc. v. United States Food & Drug Admin.*, 70 F.4th 622, 629 (2d Cir. 2023).  As with other administrative cases, district courts decide cases brought under § 7462(f)(2) on cross motions for summary judgment.  *See U.S. Dep't of Com.*, 2007 WL 2349894, at *1 ("Judicial review of agency action is often accomplished by filing cross-motions for summary judgment.").

III.    **DISCUSSION**

   A.    **Delay of Care Charge**

   Salmon "disputes [her] suspension on the merits," which I construe to mean she

challenges the DAB's decision upholding the delay of care charge.  Because Salmon is *pro se*

and because she does not make specific legal challenges to the delay of care decision, I will

evaluate the decision for violations of any of the provisions of § 7462(f)(2).  *See, e.g.*, *McCrae v.*

*Comm'r of Soc. Sec.*, No. 21-CV-2386, 2023 WL 5310759, at *3 (E.D.N.Y. Aug. 17, 2023) ("As

Plaintiff has not supplied the Court with the specific bases upon which she brings the instant

action, the Court must construe Plaintiffs letter to raise the strongest argument it suggests . . . .");

*Willis v. Comm'r of Soc. Sec.*, No. 6:05-CV-611, 2008 WL 795004, at *3 (N.D.N.Y. Mar. 24,

2008) ("Because Plaintiff's brief makes no specific legal challenges to the validity of the

Commissioner's decision, the Court will evaluate the decision for compliance with the

appropriate legal standards and basis in substantial evidence of record.").

   1.    **Substantial Evidence**

   I will first consider whether the DAB's delay of care decision was supported by

substantial evidence.  Under § 7462(f)(2)(C), courts must set aside any agency action that is

unsupported by substantial evidence.  "[T]he 'substantial evidence' bar is not especially high."

*Daly v. United States*, 669 F. App'x 19, 20 (2d Cir. 2016).  It requires only "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol.*

*Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence means "something more

than a mere scintilla, but something less than the weight of the evidence."  *United States v. Int'l*

*Bhd. Of Teamsters*, *Chauffeurs*, *Warehousemen & Helpers of Am.*, *AFL-CIO*, 315 F.3d 97, 100

(2d Cir. 2002) (internal quotation marks omitted).  When choosing between "two fairly

conflicting views," a court will not overturn the agency's decision even if the court would have

come to "a different choice had the matter been before it *de novo*." *Universal Camera Corp. v.*

*NLRB*, 340 U.S. 474, 488 (1951).  I will consider the evidence supporting each of the

specifications sustaining the charge of delay of care.

### i.      Specification A

The DAB concluded that Salmon failed to initiate home wound care services for Patient

A, resulting in a delay of patient care.  In reaching this conclusion, the DAB relied in part on the

testimony of two of Salmon's supervisors.  The DAB cited the testimony of Salmon's manager,

Luisa Howard, who "confirmed that Ms. Salmon's documentation of Veteran A's care did not

meet the appropriate case management standard of care."  ECF No. 23-1 at 1067.  Similarly, the

DAB relied on the testimony of Chief Nurse Stephanie Adkins, who "confirmed in her testimony

that Ms. Salmon did not meet VA guidelines and requirements for documenting and

communicating care needs for Veteran A."  *Id.*

Salmon claims that her supervisors took this disciplinary action against her in retaliation

for her union activity, *see* ECF No. 20 at 3; ECF No. 30 at 2, and she attempted to introduce

evidence of their bias against her.  Before the hearing, Salmon moved to add documents to the

record concerning her supervisors' alleged retaliatory motives.  For example, she attempted to

introduce news articles covering a recent equal employment opportunity ("EEO") complaint she

had filed against certain VA personnel as well as documents allegedly showing that animosity

existed between Salmon and members of management, including Adkins, concerning a grievance

that Salmon had filed in her role as AFGE Local 2138 President.  *See* ECF No. 23-1 at 366–70.

But the DAB did not allow this evidence to be added to the record.  *See id.* at 15 (denying

Salmon's motion to add documents to the record).  Similarly, at the DAB hearing, Salmon's

attorneys attempted to question her supervisors concerning their alleged bias against her due to her position as union President and her filing of the EEO complaint.  Salmon's attorney asked Salmon's manager Luisa Howard on cross examination whether "it [was] a coincidence that your reassignment [of Salmon] occurred less than a month after Ms. Salmon had filed an EEO complaint."  *Id.* at 763.  But the DAB shut down this line of questioning.  *See id.* at 764–766.  In explaining its decision to exclude this evidence, the DAB stated that "[w]e cannot take into consideration nor can we hear any issue related to an EEO complaint.  That's privy [sic] information and we're not entitled to it."  *Id.* at 765.

I find that the DAB's exclusion of this evidence was error because the evidence was relevant to the witnesses' potential bias and, thus, their credibility.  "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  *Universal Camera Corp.*, 340 U.S. at 488; *see also Butte Cnty, Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]n agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706 [of the APA, *i.e.*, 5 U.S.C. § 706].  This proposition may be deduced from case law applying the substantial evidence test, under which an agency cannot ignore evidence contradicting its position." (internal citations omitted)).  In circumstances similar to those here, the Fourth Circuit held that the exclusion of evidence of potential witness bias was error.  In *Halstead Metal Products v. NLRB*, the National Labor Relations Board excluded evidence that the plaintiff, an employer, argued "would have proved that [a witness] was biased in favor of [the petitioning employee] . . . and that [the witness] was prejudiced against [the employer]."  940 F.2d 66, 73 (4th Cir. 1991).  The Fourth Circuit noted that "[i]mpeachment evidence is crucial in Board proceedings, since the ALJ sits as judge and jury."  *Id.*  The court further explained that "[b]y excluding this evidence, the ALJ

prevented [the employer] from effectively cross-examining [the witness] so as to test her credibility." *Id.* Thus, the court held that the "evidence of bias and prejudice would be relevant in assessing [the witness's] credibility, and it was error to exclude it." *Id.*

The same is true here. Evidence of witnesses' potential bias against Salmon is undoubtedly relevant in assessing their credibility. *See, e.g.*, *United States v. Figueroa*, 548 F.3d 222, 230 (2d Cir. 2008) ("Proof of bias is almost always relevant . . . ." (quoting *United States v. Abel*, 469 U.S. 45, 52 (1984)). By refusing to consider this evidence, the DAB was unable to effectively assess the credibility of the witnesses' testimony—testimony the DAB relied on to conclude that Salmon's conduct constituted delay of Patient A's care.[2] While the DAB need not have definitively determined whether Salmon's supervisors had retaliatory motives, it should have considered any evidence of bias in deciding whether to credit the witnesses' testimony and how much weight to give that testimony.

But finding that the DAB erred in excluding this evidence does not mean I must reverse its decision. "Under the prejudicial error rule, a court will not disturb an agency's decision if it determines that the outcome of the agency action would be the same absent agency error." *Magellan Tech.*, 70 F.4th at 629. To determine "whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks omitted). Thus, I must search the evidentiary record to determine whether substantial evidence exists to support the

---

[2] As mentioned previously, the DAB relied on the testimony of Nurse Manager Howard who "confirmed that Ms. Salmon's documentation of Veteran A's care did not meet the appropriate case management standard of care." ECF No. 23-1 at 1067. And the DAB relied on the testimony of Chief Nurse Adkins, who "confirmed in her testimony that Ms. Salmon did not meet VA guidelines and requirements for documenting and communicating care needs for Veteran A." *Id.* Salmon attempted but was not permitted to introduce evidence of Howard's and Adkins' bias against her.

DAB's decision to uphold Specification A even absent the testimony of the potentially biased witnesses.

The record reflects that on October 13, 2020, Dr. Cronin, Patient A's PCP, saw the patient and referred him to home wound care services.  ECF No. 23-1 at 575.  Salmon testified that the next day, she sent Utopia the necessary documentation—including documentation of the patient's "face-to-face" with Dr. Cronin, also referred to as "history and physical" or "H&P" documentation—to initiate services.  *Id.* at 948–50.  The record is not clear what documents, if any, Salmon sent on October 14.  *See id.* at 433–35, 951–54.  When Dr. Cronin saw the patient again on October 23 for a follow-up, home wound care had not begun.  *Id.* at 651.  Dr. Cronin then entered the following note into CPRS: "Patient states that no one was coming to perform wound care and patient was doing his own leg dressings."  *See id.* at 47, 349, 976.  Dr. Cronin saw Patient A again on October 29, but home care still had not begun.  *Id.* at 584–85.  Dr. Cronin entered a comment into the case file notifying Salmon that "[Patient A] states there have been no home services for wound care.  [P]lease check."  *Id.* at 65.  Dr. Cronin testified that this note "was intended to give [Patient A's case manager] the information that whatever we thought happened didn't happen; please check."  *Id.* at 580.  On October 30, Salmon entered a case management note stating "[a] call was placed to Utopia Home Care, spoke to Cheryl 203-466-3050 to explore why the veteran does not have the services in the home.  Per Agency, waiting for fac[e] to face, face-to-face was sent with W-10 refaxed so home services can start."  *Id.* at 47, 349, 656–57.  Dr. Cronin testified that home wound care services still had not started by December 7, *id.* at 586, and on that date she entered another consult requesting in-home services for Patient A, *id.* at 661.  Another case manager, who was filling in for Salmon, responded to the consult and entered the following note into CPRS:

> Consult received from PCP for home nursing visits for the Veteran who needs wound care.  Utopia Home Care agency was contacted and can provide the service with 24.0-48.0 hours.  All documents were sent to the agency.  The Veteran [w]as contacted regarding the above, he was provided the name, contact number and start day of service and to expect a call from the agency to set up a time for visit.  The Veteran verbalized understanding and read back the information, he had no questions or concerns at this time.  Writer provide[d] her contact information as well and encouraged the Veteran to call with any future concerns regarding the home care services.

*Id.* at 58; *see also id.* at 586–87.  The record indicates that Dr. Cronin saw Patient A again on December 17 and confirmed that home wound care services had been started.  *Id.* at 351; *see also id.* at 447–48 (indicating that Utopia "open[ed] the case" on December 16).

I find that the administrative record contains substantial evidence supporting the DAB's decision to uphold Specification A—namely that Salmon's conduct resulted in a delay of care for Patient A.  Dr. Cronin's note on October 23 put Salmon on notice that home wound care had not started for Patient A, but Salmon took no action to follow-up with the agency at that point, despite her acknowledgement that it was a part of her duties to review patient charts and be abreast of their status.  *Id.* at 958.  It was only after Dr. Cronin's October 29 note that Salmon followed up with Utopia.  Per Salmon's October 30 case management note, Utopia indicated that the reason it did not start home wound care services for Patient A was that it had not received documentation of a face-to-face.  Sending such documentation was Salmon's responsibility.  *See id.* at 580–81, 673.  However, home wound care services still did not begin after Salmon contacted Utopia on October 30.  *Id.* at 586.  It was only after another case manager reached out to Utopia in December and sent the necessary materials that Patient A finally received home wound care services—some two months after Dr. Cronin's initial referral; and the fact that the other case manager was able to make the arrangements necessary to secure the care quite promptly and apparently without difficulty is a further indication that Salmon was derelict in her

13

duties.  The functional statement for a case manager indicates that it is the responsibility of a

case manager to "collaborat[e] with services internal and external to the VA to facilitate care

transition in order to effectively meet the patients' needs" and "to maintain access for new

referrals and timely follow up."  *Id.* at 291.  The evidence that Salmon did not effectively carry

out this responsibility amounts to much more than a "mere scintilla," and a reasonable mind

might accept it as adequate to support the conclusion that Salmon failed to follow VA procedures

in initiating care for Patient A, which resulted in a delay of care.

Salmon argues that the DAB failed to consider contrary evidence, but this argument is

unavailing.  She argues that "[t]he agency failed to note that [Patient A] has a lengthy history of

non-compliance and refusing care," which, she suggests, contributed to any delay in care he

experienced.  ECF No. 30 at 3.  However, the record contains evidence that Patient A was

compliant.  When asked about Patient A's "history of noncompliance," Dr. Cronin explained that

"I never felt that he was refusing to do anything that I recommended given his [transportation]

limitations."  ECF No. 23-1 at 673.  "[I]t is up to the agency, and not [the] court, to weigh the

conflicting evidence in the record."  *Clark v. Commissioner of Social Security*, 143 F.3d 115, 118

(2d Cir. 1998); *see also Borsari v. Federal Aviation Admin.,* 699 F.2d 106, 109 (2d Cir. 1983)

("[D]eference [is] traditionally afforded to the determinations of presiding officials when

questions of credibility are involved . . . .").  Thus, I defer to the DAB's credibility

determinations concerning the conflicting evidence regarding Patient A's alleged noncompliance

and any effect that noncompliance might have had on his care.[3]

---

[3] In any event, the record indicates that any delay as a result of Patient A's noncompliance would have occurred in
late December 2020—over two months after Dr. Cronin initially referred Patient A to home wound care.  *See* ECF
No. 23-1 at 447–48 (indicating that Patient A "refused visits on 12/23 and 12/24").  I have found no evidence
suggesting that Patient A's alleged noncompliance had any effect on the delay of care occurring between October 13
and late December 2020.

Salmon also argues that the any delay in patient care was a result of her "very heavy workload," which she called "unmanageable" and "the largest workload of any Registered Nurse Case Manager in the hospital." ECF No. 30 at 1. But there is no evidence in the record other than Salmon's own testimony indicating that she had an unusually high workload.[4] Again, I will defer to the credibility determination of the DAB concerning evidence of Salmon's workload. In any event, there is no indication in the VA Handbook or elsewhere that a heavy workload would excuse conduct resulting in a delay of home wound care for nearly two months after the doctor's order directing that such care be provided.

In sum, even absent the testimony of Salmon's allegedly biased supervisors, there is substantial evidence in the record supporting the conclusion that Salmon failed to fulfill her responsibilities, which resulted in a delay of Patient A's care. I therefore uphold the Secretary's decision to sustain Specification A.

## ii.   Specification B

The DAB explained that, based on the record evidence, "[t]here was no indication that Beacon Hospice actually received . . . the appropriate amount of information to actually initiate care for Patient B." ECF No. 23-1 at 1070. It noted that "Salmon failed to provide evidence or testimony that she, in fact, initiated Hospice Care for Patient B" and that record evidence indicates that a social worker, rather than Salmon, ultimately set up hospice care for Patient B. *Id.* at 1069. Based on this evidence, the DAB concluded that Salmon "failed to send all required documents to initiate hospice care for Veteran B at the end of his life." *Id.* at 1070.

---

[4] To the contrary, when asked about Salmon's caseload from October to January 2020, Howard, Salmon's manager, testified that "I can verify that her caseloads were at the lower half of the Case Management list. So if there are eight Case Managers that are doing Case Management, her case numbers were at the lower half." ECF No. 23-1 at 770; *see also id.* at 771("Q. Isn't it a fact that [Salmon] had the highest caseload of any of the Case Managers that you oversaw between October and January 2020?  A.  No."). I will not consider this evidence, however, since the DAB did not allow Salmon to introduce evidence of Howard's alleged bias against Salmon on cross-examination.

I find that the DAB's decision upholding Specification B is supported by substantial evidence.  Salmon entered an addendum into Patient B's CPRS file on December 31, 2020 stating that "[p]atient needs to be seen ASAP," *id.* at 84, but she did not document what information she sent to Beacon, *id.* at 561–62, 609.  Further, the addendum she entered identifies the contact at Beacon as a "business manager"—not a sign that an appropriate person at Beacon had received the information.  *See id.* at 562 (Oshinski testifying that it was "disturbing" that it was a business manager, and "not a clinical person who took this.").  It is uncontested that Patient B did not receive home hospice services in the days following Salmon's entry of the addendum.  *See id.* at 75 (CPRS note from Mallory Baker indicating that home hospice services had not begun by January 2, 2021 at 3:00 PM).  On January 2, 2021, Patient B's daughter called the hospital indicating that Patient B had yet to receive hospice services.  *See id.* at 459.  On that day, a social worker, Mallory Baker, documented the need for hospice services, faxed the necessary clinical information to Beacon, called Beacon to ensure its receipt of the information, and documented on CPRS the information she sent to the agency.  *Id.* at 75–77.  Hospice services arrived later that day, just before Patient B died.  *Id.* at 636.  Again, the fact that the social worker successfully secured hospice services the same day she received word about the need to do so is some indication that Salmon, despite her addendum on December 31, failed to take all the steps she should have to obtain the services "ASAP," as she indicated was necessary. Dr. Cronin later reported that Patient B's daughter stated that "the process [of receiving home hospice services] was not smooth" and that "the ball was dropped."  *Id.* at 73.  A reasonable mind could consider this evidence—*i.e.*, (i) that hospice services did not begin after Salmon's entry of the addendum, (ii) that Salmon did not indicate which documents she sent to Beacon, and (iii) that hospice services began almost immediately after Baker's referral—sufficient to

16

support the conclusion that Salmon failed to send the necessary documentation required to

initiate hospice services for Patient B.  As Dr. Andrea Ruskin explained, "[i]t's unclear . . . that it

was Sandra Salmon that actually contacted [Beacon] successfully."  *Id.* at 462.  Although it is

possible that Beacon mishandled Salmon's referral, "the possibility of drawing two inconsistent

conclusions from the evidence does not prevent an administrative agency's finding from being

supported by substantial evidence." *Cellular Phone Taskforce v. F.C.C.*, 205 F.3d 82, 89 (2d

Cir. 2000); *see also Universal Camera Corp.*, 340 U.S. at 488 (court may not "displace [the

agency's] choice between two fairly conflicting views").  As such, I find that substantial

evidence supports the DAB's decision to sustain Specification B, and I therefore uphold that

decision.

## 2.       Required Procedures

The governing statute also requires me to determine if the DAB's decision was  "obtained

without procedures required by law, rule, or regulation having been followed."  38 U.S.C. §

7462(f)(2)(B).

As mentioned previously, Salmon argues that Patient A has a "lengthy history of non-

compliance and refusing care," and she suggests that the Secretary failed to follow required

procedures in that she "was denied at every opportunity to review the medical records and to

receive the phone records" regarding Patient A's alleged noncompliance.  ECF No. 30 at 3.

Although this is somewhat unclear, Salmon seems to suggest that the Secretary's alleged failure

in providing her access to these records violates Veterans Health Administration ("VHA")

Directive 1605.01, a portion of which she attached to her motion for summary judgment.  *See*

ECF No. 30 at 8–11.  This Directive provides instruction regarding the VA's "collect[ion], us[e]

and disclos[ure of] personally identifiable information."  Dep't of Veterans Affs., VHA Directive

17

1605.01: Privacy and Release of Information, 1 (2023) ("VHA Directive 1605.01") (available at: https://www.va.gov/vhapublications/ViewPublication.asp?pub_ID=11388).  Salmon points to a portion of the Directive entitled "Right of Access and/or Review of Records," which governs the release of individually identifiable information.  ECF No. 30 at 8.  Although Salmon makes no argument to this effect, she seems to suggest in attaching this section of VHA Directive 1605.01 that the Directive entitled her to review Patient A's records.  But the Directive governs patient's privacy rights, and the portion of the Directive to which Salmon points governs patients' right to access *their own* information.  The Directive indicates that individuals seeking access to their records must "verify their identity . . . to provide assurance that they are not improperly given access to records pertaining to someone else."  *Id.; see also* VHA Directive 1605.01 at 19.  And as the current version of the Directive makes clear,[5] the section of the Directive Salmon attached to her motion governs only "[r]equests from individuals for access to review *their* individually identifiable information . . . ."  VHA Directive 1605.01 at 20 (emphasis added).  This portion of the Directive does not give Salmon a right to access the records of Patient A or any other patient; rather, it gives patients the right to access "information *pertaining to them* that is maintained . . . by VHA."  *Id.* (emphasis added).  Moreover, the Directive instructs that "[a]ll written requests to review, or obtain copies of, records must be received by mail, fax, in person or by mail referral from another agency or VA office."  *Id.; see also* ECF No. 30 at 8.  Salmon does not indicate whether she initiated any such request.

Salmon also cites *Brady v. Maryland*, 373 U.S. 83 (1963), for the proposition that the agency was required to provide her with exculpatory evidence, but the protections established in *Brady* apply only to criminal prosecutions.  *See, e.g.*, *Vandever v. Murphy*, No. 3:09-CV-1752,

---

[5] VHA Directive 1605.01 was amended on July 24, 2023.  *See* VHA Directive 1605.01 at T-1.

2013 WL 4522483, at *2 n.2 (D. Conn. Aug. 27, 2013).  Thus, *Brady* did not require the Secretary to send Salmon evidence favorable to her.[6]

In any event, the fact that Salmon was allegedly not allowed to review Patient A's records does not constitute prejudicial error because her attorneys introduced evidence of Patient A's noncompliance into the record through the testimony of witnesses at the hearing.  *See, e.g.*, ECF No. 23-1 at 556, 671–73; *see also Ward v. Derwinski*, 837 F. Supp. 517, 522 (W.D.N.Y. 1992) (holding that the fact that the "plaintiff was not allowed to review [a patient's] medical records or to introduce them into evidence" did not constitute reversible error because the sought after evidence "was introduced through the testimony of several witnesses").  In any event, as noted above, even if Patient A's records had revealed more evidence of noncompliance, this would not have excused Salmon's failure to secure home wound care services for him.

For these reasons, I hold that the DAB did not violate any "procedures required by law, rule, or regulation" by failing to provide Salmon with records regarding Patient A.

## B.    Penalty Determination

Salmon also challenges the VA's penalty determination.  When an agency determines that an employee has committed a violation, "the choice of a sanction is largely within the agency's discretion."  *Merritt v. United States,* 960 F.2d 15, 17 (2d Cir. 1992).  A court will not overturn an agency's punishment determination unless it finds the sanction to be arbitrary and capricious.  *See, e.g.*, *Ward*, 837 F. Supp. at 523 (noting that an agency's determination of punishment "will not be upset on review unless it is deemed to be arbitrary and capricious.");

---

[6] Similarly, though Salmon does not cite this statute, 38 U.S.C. § 7462(b)(1)(A) also does not require the Secretary to send Salmon evidence favorable to her.  That statute states that an employee subject to a major adverse employment action is entitled to, among other things, "a file containing all the evidence *in support of each charge*." 38 U.S.C. § 7462(b)(1)(A) (emphasis added).  It does not require the Secretary to provide the employee with evidence favorable to him or her.  Thus, the Secretary did not violate the procedures set forth in § 7462(b)(1)(A) by failing to provide Salmon with evidence of Patient A's alleged history of noncompliance.

*Fineman v. United States Postal Service*, 555 F. Supp. 1336, 1344 (S.D.N.Y. 1983) ("Whatever this Court's view of the penalty, the agency determination must be upheld unless it is so harsh as to amount to such an abuse of discretion that upon all the facts it can be said to be arbitrary and capricious.").  An agency's penalty determination is arbitrary and capricious if it is "unwarranted in law . . . or without justification in fact . . . ."  *Harry Klein Produce Corp. v. United States Dep't of Agric.*, 831 F.2d 403, 406 (2d Cir. 1987).

When imposing a penalty for employee misconduct, the VA has a policy of considering the "[c]onsistency of the penalty" imposed for similar offenses.  ECF No. 23-1 at 314.  In other words, the deciding official must make an effort to take "like [disciplinary] actions . . . for like offenses."  *Id.* at 313.  In support of this policy, the VA publishes a "table of penalties," which provides a list of common offenses as well as a range of recommended penalties for first, second, and third offenses.  *See id.* at 317–29.

The instructions for implementing the table of penalties stress that the table is merely to be used as a "<u>guide</u>," *id.* at 313 (emphasis in original), and deciding officials are to consider several other factors in addition to the table, which are described as "mitigating and aggravating factors" and are listed in the "Instructions for Use of Table," *see id.* at 313–16.  The instructions also explain that

> [t]he table is designed to be sufficiently broad to include most types of offenses, but is not intended to be an exhaustive listing of all offenses.  For other offenses, appropriate penalties may be prescribed by decision officials for application within their jurisdiction, consistent with the range of penalties for comparable offenses listed in the table.  Disciplinary penalties will generally fall between the ranges indicated in the guide, but in unusual circumstances greater or lesser penalties may be imposed.

*Id.*  "When an employee has committed a combination or series of offenses," the instructions state that "a greater penalty than is listed for a single offense may be appropriate."  *Id.* at 316.

Salmon argues that her punishment violated the table of penalties.  "Delay of care"—the
offense Salmon was charged with—does not appear as a violation in the table of penalties.  *See
id.* at 317–29.  Salmon argues that the VA erred by comparing her offense to "[a]buse of patients
or beneficiaries" when determining the appropriate punishment.  ECF No. 23-1 at 317, 526–27.
The maximum penalty for a first offense of patient abuse is removal.  *Id.* at 317.  Salmon argues
that the Secretary should have compared her offense to either "[c]areless or negligent
workmanship resulting in waste or delay" or "[d]eliberate failure or unreasonable delay in
carrying out instructions."  ECF No. 20 at 3.  The punishment levels for a first offense for each
of these violations range from admonishment to reprimand.  ECF No. 23-1 at 319, 321.

The offenses Salmon proposes miss the mark in that they do not account for the
consequences of Salmon's delay of patient care.  Oshinski explained that her decision to
compare Salmon's offense to patient abuse stemmed from her conclusion that the delays in care
caused significant patient harm.  As she explained:

> [I]n both of the cases . . . we have veterans who were left without crucial care,
> things that had been ordered by the physicians did not actually come and assist them
> really in some very difficult and challenging times in their lives.  And one [of the
> veterans] . . . was without care in the final days of his life because there was no
> action taken.  . . .  I feel we caused harm to those veterans and their families.

*Id.* at 522–23.  Oshinski added that, with respect to Patient A, "there was extreme suffering by
the patient over an extended period of time" as a result of the delay in care.  *Id.* at 557.  And with
respect to Patient B, she noted that the delay in care "made that passing much more traumatic
both likely for the individual as well as the family."  *Id.* at 545.  Neither "[c]areless or negligent
workmanship resulting in waste or delay" nor "[d]eliberate failure or unreasonable delay in
carrying out instructions" accounts for the impact of Salmon's two offenses on the patients and

their families.  Patient abuse does.  For this reason, I hold that the Secretary's comparison of Salmon's offenses to patient abuse was not arbitrary or capricious.

Moreover, as the instructions to the table indicate, the table is merely to be used as a guide, and deciding officials should consider several other factors in making their penalty determination.  Oshinski considered these other factors and found several of them compelling. First, Oshinski noted that she was "disturbed" by Salmon's failure to take responsibility, explaining that Salmon "seemed like she was blaming everyone else for everything that happened."  *Id.* at 525–26 (tying this observation to factor addressing "[m]anagement's confidence in the employee's ability to successfully perform and behave in the future," *id.* at 313).  Oshinski explained that "as a manager . . . you do worry about when somebody thinks that any issues that arise are due to somebody else not doing what they need to do."  *Id.* at 526; *see also id.* at 529 ("I was very disturbed by her responses to the fact-finding, looking to blame somebody else for most of the things that were going on.").  Second, Oshinski noted that Salmon's conduct would have a detrimental effect on the reputation of the agency, another of the factors prescribed in the "Instructions for Use of the Table."  *See id.* at 314.  As she explained:

> [O]bviously this is not good for the reputation of our Agency if it seems like our people are not following up and making sure that veterans are getting the care that they need, or not being responsive when there are concerns that are raised. . . .  I think that it was very bad for the reputation of the Agency . . . .

*Id.* at 527–28.  Third, Oshinski explained that Salmon did not show a strong potential for rehabilitation, noting that "it does seem like [Salmon] had a lot of issues with the first case [*i.e.*, Patient A], got some feedback[,] and it didn't improve on the second case [*i.e.*, Patient B]."  *Id.* at 529; *see id.* at 314 (listing "potential for the employee's rehabilitation" as another factor to consider in the penalty determination).  After considering the table of penalties as well as these and other aggravating and mitigating factors, Oshinski concluded that a 15-day suspension was

the appropriate penalty for Salmon's conduct.  I hold that this penalty determination is neither "unwarranted in law . . . [n]or without justification in fact."  To the contrary, the Secretary's penalty determination was supported by the seriousness of the offenses and their impact on the patients involved, the fact that the second offense was a repeat violation within a few months of the first (*see* ECF No. 23-1 at 316 (noting that a "combination or series of offenses" may warrant greater punishment)), Salmon's failure to take responsibility, the effect of Salmon's conduct on the reputation of the agency, and Salmon's potential for rehabilitation—all of which are factors the table of penalty's instructions advise deciding officials to consider, *see* ECF No. 23-1 at 313–14.

Because the Secretary's penalty determination was neither "unwarranted in law . . . [n]or without justification in fact," it was not arbitrary or capricious.

## IV.    CONCLUSION

For the reasons stated above, I GRANT the Secretary's motion for summary judgment and DENY Salmon's motion for summary judgment.  The Clerk is directed to close this case.

IT IS SO ORDERED.


                                        /s/
                                    Michael P. Shea, U.S.D.J.


Dated:  Hartford, Connecticut
        February 2, 2024